ROBBINS UMEDA & FINK LLP
BRIAN J. ROBBINS (190264)
MARC M. UMEDA (197847)
STEVEN J. SIMERLEIN (156979)
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@rulaw.com
mumeda@rulaw.com
ssimerlein@rulaw.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE BLUE COAT SYSTEMS, INC. DERIVATIVE LITIGATION | Lead Case No. 5:06-cv-04809-JF (Consolidated with 5:06-cv-05453) |
| This Document Relates To: | Judge: Hon. Jeremy Fogel |
| ALL ACTIONS. | VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT |
| KERMIT BAKER and CAROLYN ADDUCI, Derivatively on Behalf of BLUE COAT SYSTEMS, INC., | |
| Plaintiffs, | |
| vs. | |
| BRIAN M. NESMITH, DAVID A. DE SIMONE, STEPHEN P. MULLANEY, DAVID L. COX, JR., CAMERON S. LAUGHLIN, KEVIN S. ROYAL, DAVID W. HANNA, JAMES A. BARTH, TIMOTHY A. HOWES, KEITH GEESLIN, MICHAEL A. MALCOM, MICHAEL J. JOHNSON, ALAN L. ROBIN, ROBERT VERHEECKE, JOHN M. SCHARBER, TOM AYERS, RANGASWAMY VASUDEVAN, WILLIAM S. WARNER, SUSAN HOVATTER THORNTON, STUART PHILLIPS, MARC ANDREESSEN, ANDREW | |
| [caption continued on the following page] | |

1  S. RACHLEFF, PHILIP J. KOEN and ERNST  )
   & YOUNG LLP,                            )
2                                          )
                     Defendants,           )
3                                          )
           -and-                           )
4                                          )
   BLUE COAT SYSTEMS, INC., a Delaware     )
5  corporation,                            )
                                           )
6                    Nominal Defendant.    )
7  _____)  <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, by their attorneys, submit this Amended Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a consolidated shareholder derivative action brought by two shareholders of Blue Coat Systems, Inc. ("Blue Coat" or the "Company") on behalf of the Company against certain of its officers and directors and against the Company's outside auditors, Ernst & Young LLP ("E&Y"), seeking to remedy defendants' violations of state and federal law, including violations of the Securities Exchange Act of 1934 ("Exchange Act") and the California Corporations Code, breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, professional negligence and accounting malpractice that have caused substantial losses to Blue Coat and other damages, such as to its reputation and goodwill.  On behalf of Blue Coat, this action seeks, among other things, damages, corporate governance reforms, an accounting, rescission, restitution and the declaration of a constructive trust to remedy defendants' violations of state and federal law.

2.      On April 17, 2000, four Blue Coat senior officers, defendants Michael J. Johnson ("Johnson"), Rangaswamy Vasudevan ("Vasudevan"), Alan L. Robin ("Robin") and William S. Warner ("Warner"), received options to buy 88,000 shares.  In accordance with Blue Coat's stock option plans in effect during April 2000, the grants to these defendants were priced at $152.50 per share, Blue Coat's stock price on April 17, 2000.

3.      After the Blue Coat officers received the grants priced at Blue Coat's April 17, 2000 stock price, the Company's share price more than doubled over the following two months. Specifically, the 88,000 shares underlying options, which were worth nothing at the time they were granted, grew in value to over *$19 million* in just two weeks later and then eventually appreciated to over *$24 million* after two months.  Even more astonishing, these options were priced at Blue Coat's lowest stock price for the thirteen-month period of November 19, 1999 through December 20, 2000. These option grants and Blue Coat's stock price movement are illustrated by the following graph:

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT



April 2000 Stock Option Grants

On April 17, 2000, options were granted at an exercise price of $152.50 per share - the lowest share price for the period beginning November 19, 1999 through December 20, 2000 - to the following Blue Coat insiders:

Michael J. Johnson (1)     30,000        Alan L. Robin (1)       30,000
Rangaswamy Vasudevan (2)   24,000        William S. Warner (2)    4,000

On April 28, 2000, defendants' options were worth approximately $19,250,000.

On July 13, 2000, defendants' options were worth approximately $24,640,000.

(1) On June 14, 2000, defendants Johnson and Robin reported these grants on Form 5's.
(2) No disclosures located for these defendants.

4.      The selection of a date of April 17, 2000 for these options did not involve mere fortuitous timing, however. This grant was part of a grander scheme reaching back to at least 1999, in which certain Blue Coat insiders manipulated stock option grant dates so as to secretly maximize the option recipients' profits. Specifically, certain Blue Coat insiders changed stock option grant dates to take advantage of lower exercise prices than the price of the stock on the actual grant date. The price of Blue Coat shares on the reported option grant date, therefore, was lower than the share price on the actual day options were issued. By engaging in this scheme, Blue Coat insiders enjoyed an instant paper gain and defendants were able to conceal from investors that they were violating shareholder-approved stock option plans, that the Company was not recording material compensation expenses, and that it was materially overstating Blue Coat's net income and earnings per share. This illegal practice has become commonly known as "backdating."

5.      Besides backdating, certain of the defendants also engaged in a type of options manipulation known as "springloading." "Springloading" involves the timing of option grants to take advantage of non-public positive material information. Specifically, a springloaded options grant is dated just before a positive news release to create a springload effect whereby the options

- 2 -

1   grant immediately appreciates by a substantial amount as the market absorbs the information.  For

2   example, on May 2, 2005, defendants authorized grants of 75,000 shares underlying options one day

3   before Blue Coat announced a lucrative contract with the state of Delaware.  This "springloaded"

4   option grant appreciated by over 40% over the following 20 days.

5         6.     In short, the April 17, 2000 and May 2, 2005 grants allowed certain of the defendants

6   to make some very quick and substantial profits at the Company's expense.  Indeed, by 2006, these

7   defendants had acquired millions of dollars worth of manipulated Blue Coat stock options.

8         7.     Moreover, as illustrated by backdated grants during September 2003 and August

9   2004, as alleged below, certain of the defendants remained undeterred by the stringent filing

10   regulations of the Sarbanes-Oxley Act of 2002 ("SOX"), which required them to disclose their

11   option grants within two business days of the actual grant date.  These defendants did not bother to

12   disclose their grants for months – sometimes *years* – later.

13         8.     During July 2006, Blue Coat announced for the first time that an internal

14   investigation of the Company's prior options grant practices was being conducted.  The Company

15   later announced that a restatement of its publicly-filed financial statements would be necessary to

16   correct for previously-hidden stock option compensation expenses that had been incorrectly

17   accounted for.

18         9.     Blue Coat filed its restatement on March 28, 2007, along with limited disclosures of

19   the findings of its internal investigation.  These findings conveyed some very disturbing news.

20   Apparently, the investigation had determined that "***nearly all***" of Blue Coat's stock options granted

21   since November 18, 1999 had been manipulated.  How did this happen?

22        10.     The primary explanation is that Blue Coat's board of directors (the "Board") and

23   Compensation Committee recklessly authorized options grants.  Indeed, on many occasions, the

24   Board and Compensation Committee did not even meet personally to approve stock option grants.

25   Rather, the Board and Compensation Committee relied upon easily-manipulated faxed unanimous

26   written consent forms.  Such forms effectively amounted to "blank checks" evidencing an utter lack

27   of internal controls but reasonably calculated to prevent the detection of the manipulation of stock

28   option grants.

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

11.     Moreover, the Compensation Committee refused to adequately inform itself as to the implications of stock option misdating before approving options.   Thus, the Compensation Committee routinely approved stock option grants weeks after the options grant date. E&Y, as Blue Coat's outside auditor, failed to detect and/or sufficiently question this illicit, pervasive practice at the Company.

12.     As a result of the defendants' improprieties, the Company has and will need to expend significant sums of money and has incurred significant damages as alleged herein.   Further, Blue Coat's business reputation has been severely damaged by defendants' selfish actions, which portray a Company compromised by a systemic lack of managerial integrity.   Accordingly, this action is necessary to end defendants' illegal option-manipulating practices and to restore assets to the Company that have been squandered via the payment of undisclosed and undeserved compensation to corporate insiders.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331. Plaintiffs' claims arise in part under the Constitution and laws of the United States, including SOX and the Exchange Act.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiffs and each defendant, and the amount in controversy exceeds $75,000.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.   This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, including the defendants' primary participation in the wrongful acts detailed herein, aiding and abetting, and conspiracy in violation of fiduciary duties owed to Blue Coat, occurred in substantial part in this

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   District. Finally, defendants have received substantial compensation in this District by doing

2   business here and engaging in numerous activities that had an effect in this District.

3   **PARTIES**

4   16.   Plaintiff Carolyn Adduci ("Adduci") is, and was at times relevant hereto, an owner

5   and holder of Blue Coat stock. Plaintiff Adduci is a citizen of Massachusetts.

6   17.   Plaintiff Kermit Baker ("Baker") is, and was at times relevant hereto, an owner and

7   holder of Blue Coat stock. Plaintiff Baker is a citizen of Florida.

8   18.   Nominal Defendant Blue Coat, formerly known as Cacheflow, Inc., ("Cacheflow") is

9   a Delaware corporation with its principal executive offices located at 650 Almanor Avenue,

10  Sunnyvale, California. According to its public filings, Blue Coat provides proxy appliances related

11  to the visibility and control of internet communications.

12  19.   Defendant Brian M. NeSmith ("NeSmith") is Blue Coat's President, Chief Executive

13  Officer ("CEO") and a director and has been since March 1999. NeSmith is a member of Blue

14  Coat's Stock Option Committee and has been since 2005. Because of NeSmith's positions, he knew,

15  consciously disregarded, was reckless or grossly negligent in not knowing or should have known that

16  Blue Coat insiders were improperly manipulating stock option grants to maximize their personal

17  profits, via access to internal corporate documents, conversations and connections with other

18  corporate officers and employees, attendance at management and Board meetings and committees

19  thereof, as well as reports and other information provided to him in connection therewith. NeSmith

20  received at least 100,000 options that were dated at or very close to the lowest stock price for the

21  month during which options were granted. Accordingly, on information and belief, plaintiffs allege

22  that NeSmith manipulated these stock options and received illegal compensation from Blue Coat that

23  was not disclosed to the Company's shareholders. Blue Coat paid NeSmith the following

24  compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|
| 2006 | $250,000 | $6,963 | 27,000 |
| 2005 | $250,000 | - | - |
| 2004 | $135,000 | - | 50,000 |
| 2003 | $20,000 | - | 100,000 |
| 2002 | $250,000 | - | - |

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | |
|---|---|---|---|
| 2001 | $225,000 | - | - |
| 2000 | $175,000 | - | 200,000 |
| 1999 | $28,494 | - | 2,000,000 |

Defendant NeSmith sold 412,877 of his personally-held shares for $23,437,748.01 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant NeSmith is a citizen of California.

20. Defendant David A. de Simone ("de Simone") is Blue Coat's Senior Vice President of Engineering and has been since September 2003. De Simone also served as an independent consultant who provided technical assistance and executive coaching to several Blue Coat clients from December 2002 to September 2003. Because of de Simone's position, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. De Simone received at least 180,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that de Simone manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders. Blue Coat paid de Simone the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|
| 2006 | $250,000 | $13,213 | 16,000 |
| 2005 | $250,000 | $137,500 | - |
| 2004 | $164,904 | $13,545 | 180,000 |

Defendant de Simone sold 55,000 of his personally-held shares for $2,136,745.34 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant de Simone is a citizen of California.

21. Defendant Stephen P. Mullaney ("Mullaney") is Blue Coat's Vice President of Worldwide Marketing and has been since July 2003. Because of Mullaney's position, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Mullaney received at least 88,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Mullaney manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders. Blue Coat paid Mullaney the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|
| 2006 | $236,891 | $5,625 | 15,000 |
| 2005 | $205,000 | $14,876 | - |
| 2004 | $145,747 | $10,638 | 88,000 |

Defendant Mullaney sold 25,000 of his personally-held shares for $886,850.10 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Mullaney is a citizen of California.

22.     Defendant David L. Cox, Jr. ("Cox") is Blue Coat's Vice President of Operations, responsible for Manufacturing, and has been since July 2003. Because of Cox's position, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Cox received at least 66,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Cox manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders. Blue Coat paid Cox the following compensation:

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|
| 2004 | $151,539 | $12,500 | 66,000 |

Defendant Cox sold 17,200 of his personally-held shares for $660,612.48 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Cox is a citizen of California.

23.     Defendant Cameron S. Laughlin ("Laughlin") is Blue Coat's Secretary and General Counsel and has been since October 2004. Laughlin is also Blue Coat's Vice President and has been since May 2004. Laughlin was also Blue Coat's Corporate Counsel from May 2004 to October 2004. Because of Laughlin's positions, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Laughlin received at least 42,500 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Laughlin manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders. Defendant Laughlin sold 11,987 of his personally-held shares for $481,608.17 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Laughlin is a citizen of California.

24.     Defendant Kevin S. Royal ("Royal") is Blue Coat's Senior Vice President and Chief Financial Officer ("CFO") and has been since May 2005. Because of Royal's positions, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith.     Defendant Royal received 75,000

springloaded options timed immediately before the release of positive-previously-undisclosed material information.  Blue Coat paid Royal the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|
| 2006 | $300,000 | $9,234 | 75,000 |

Defendant Royal is a citizen of California.

25.     Defendant David W. Hanna ("Hanna") is Blue Coat's Chairman of the Board and has been since February 2001.  Hanna also has been a Blue Coat director since October 1996.  Hanna was also Blue Coat's interim President and CEO from December 1998 to March 1999.  Hanna is a member of Blue Coat's Audit Committee and has been since 2001 and a member of the Compensation Committee and has been since 2000.  Because of Hanna's positions, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  Hanna received at least 17,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.   Accordingly, on information and belief, plaintiffs allege that Hanna manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders.  Defendant Hanna sold 64,135 of his personally-held shares for $3,356,221.65 in proceeds while in possession of material, non-public information concerning the illegally undisclosed manipulated stock option grant practices.  Defendant Hanna is a citizen of California.

26.     Defendant James A. Barth ("Barth") is a Blue Coat director and has been since January 2005.  Barth is Chairman of Blue Coat's Audit Committee and has been since 2005 and a member of the Compensation Committee and has been since 2005.  Because of Barth's positions, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their

1   personal profits, via access to internal corporate documents, conversations and connections with

2   other corporate officers and employees, attendance at Board meetings and committees thereof, as

3   well as reports and other information provided to him in connection therewith. Defendant Barth is a

4   citizen of California.

5          27.     Defendant Timothy A. Howes ("Howes") is a Blue Coat director and has been since

6   December 2005. Howes is a member of Blue Coat's Audit Committee and has been since 2006.

7   Because of Howes' positions, he knew, consciously disregarded, was reckless or grossly negligent in

8   not knowing or should have known that Blue Coat insiders were improperly manipulating stock

9   option grants to maximize their personal profits, via access to internal corporate documents,

10  conversations and connections with other corporate officers and employees, attendance at Board

11  meetings and committees thereof, as well as reports and other information provided to him in

12  connection therewith. Defendant Howes is a citizen of California.

13         28.     Defendant Keith Geeslin ("Geeslin") is a Blue Coat director and has been since

14  June 2006. Geeslin is a member of Blue Coat's Stock Option Committee and has been since 2007.

15  Because of Geeslin's positions, he knew, consciously disregarded, was reckless or grossly negligent

16  in not knowing or should have known that Blue Coat insiders were improperly manipulating stock

17  option grants to maximize their personal profits, via access to internal corporate documents,

18  conversations and connections with other corporate officers and employees, attendance at Board

19  meetings and committees thereof, as well as reports and other information provided to him in

20  connection therewith. Defendant Geeslin is a citizen of California.

21         29.     Defendant Michael A. Malcolm ("Malcolm") was Blue Coat's Chairman of the Board

22  from March 1996 to November 2000. Malcolm was also Blue Coat's President and CEO from June

23  1997 to December 1998. Because of Malcolm's positions, he knew, consciously disregarded, was

24  reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were

25  improperly manipulating stock option grants to maximize their personal profits, via access to internal

26  corporate documents, conversations and connections with other corporate officers and employees,

27  attendance at management and Board meetings and committees thereof, as well as reports and other

28  information provided to him in connection therewith. Defendant Malcolm sold 500,000 of his

personally-held shares for $42,109,690 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Malcolm is a citizen of California.

30.    Defendant Johnson was Blue Coat's Vice President, CFO from July 1999 to March 2001. Johnson was Blue Coat's Secretary from about September 1999 to at least November 1999. Because of Johnson's positions, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Johnson received at least 30,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Johnson manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders. Blue Coat paid Johnson the following compensation:

| Fiscal Year | Salary | Securities Underlying Options |
|---|---|---|
| 2001 | $204,850 | - |
| 2000 | $137,199 | 490,000 |

Defendant Johnson sold 137,694 of his personally-held shares for $10,921,802.47 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Johnson is a citizen of South Dakota.

31.    Defendant Robin was Blue Coat's Senior Vice President, Worldwide Sales from July 1999 to April 2002. Because of Robin's position, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Robin received at least 60,000 options that were dated at or very close to the lowest stock

price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Robin manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders. Blue Coat paid Robin the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards (number of shares) | Securities Underlying Options |
|---|---|---|---|---|
| 2002 | $390,384 | $117,997 | - | 150,000 |
| 2001 | $200,000 | $169,259 | 75,000 | - |
| 2000 | $115,385 | $471,523 | - | 622,000 |

Defendant Robin sold 125,000 of his personally-held shares for $10,711,831.35 in proceeds while in possession of material, non-public information concerning the manipulated stock option grant practices. Defendant Robin is a citizen of California.

32.     Defendant Robert Verheecke ("Verheecke") was Blue Coat's Senior Vice President, CFO and Secretary from May 2001 to May 2005. From May 2005 to January 2006, Verheecke remained a Blue Coat employee who was responsible for projects related to business development and financial systems implementation. Because of Verheecke's positions, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Verheecke received at least 250,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Verheecke manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders. Blue Coat paid Verheecke the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|
| 2005 | $250,000 | $18,125 | - |
| 2004 | $250,000 | $20,625 | 40,000 |
| 2003 | $250,000 | $18,750 | 50,000 |
| 2002 | $231,250 | $28,125 | 100,000 |

- 12 -

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1    Defendant Verheecke sold 22,000 of his personally-held shares for $1,020,080.50 in proceeds while

2    in possession of material, non-public information concerning the manipulated stock option grant

3    practices. Defendant Verheecke is a citizen of California.

4          33.    Defendant John M. Scharber ("Scharber") was Blue Coat's Vice President and Chief

5    Technology Officer ("CTO") from May 2001 to July 2001. Scharber was also Blue Coat's Vice

6    President of Research and Development for Streaming Technology from December 2000 to May

7    2001. Because of Scharber's positions, he knew, consciously disregarded, was reckless or grossly

8    negligent in not knowing or should have known that Blue Coat insiders were improperly

9    manipulating stock option grants to maximize their personal profits, via access to internal corporate

10   documents, conversations and connections with other corporate officers and employees, attendance

11   at management meetings, as well as reports and other information provided to him in connection

12   therewith. Scharber received at least 65,000 options that were dated at or very close to the lowest

13   stock price for the month during which options were granted. Accordingly, on information and

14   belief, plaintiffs allege that Scharber manipulated these stock options and received illegal

15   compensation from Blue Coat that was not disclosed to the Company's shareholders. Blue Coat paid

16   Scharber the following compensation:

17

| Fiscal Year | Salary | Securities Underlying Options |
|---|---|---|
| 2002 | $155,316 | - |
| 2001 | $73,125 | 425,000 |

18

19

20   Defendant Scharber sold 60,000 of his personally-held shares for $351,730 in proceeds while in

21   possession of material, non-public information concerning the manipulated stock option grant

22   practices. Defendant Scharber is a citizen of California.

23          34.    Defendant Tom Ayers ("Ayers") was Blue Coat's Senior Vice President of Worldwide

24   Field Operations from November 2004 to November 2006 and remained a Blue Coat employee, until

25   April 2007. Ayers was also Blue Coat's Senior Vice President of Sales from October 2002 to

26   November 2004. Because of Ayers' positions, he knew, consciously disregarded, was reckless or

27   grossly negligent in not knowing or should have known that Blue Coat insiders were improperly

28   manipulating stock option grants to maximize their personal profits, via access to internal corporate

documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith.  Defendant Ayers received 35,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information.  Blue Coat paid Ayers the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|
| 2006 | $200,000 | $190,094 | 25,000 |
| 2005 | $187,500 | $162,784 | - |
| 2004 | $175,000 | $150,857 | 35,000 |
| 2003 | $90,192 | $41,732 | 66,000 |

Defendant Ayers is a citizen of Texas.

35.     Defendant Vasudevan was Blue Coat's CTO from August 1997 to April 2001. Because of Vasudevan's position, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith.  Vasudevan received at least 24,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Vasudevan manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders.  Blue Coat paid Vasudevan the following compensation:

| Fiscal Year | Salary | Securities Underlying Options |
|---|---|---|
| 2000 | $150,000 | 120,000 |
| 1999 | $149,907 | - |

Defendant Vasudevan is a citizen of California.

36.     Defendant Warner was Blue Coat's Vice President of Business Development from August 1999 to April 2001.  Warner was also Cacheflow's Vice President of Sales from September 1997 to August 1999.  Because of Warner's positions, he knew, consciously disregarded, was

reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. Warner received at least 4,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Warner manipulated these stock options and received illegal compensation from Blue Coat that was not disclosed to the Company's shareholders. Blue Coat paid Warner the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|
| 2000 | $150,000 | $48,085 | 20,000 |
| 1999 | $149,889 | $40,000 | - |

Defendant Warner is a citizen of California.

37.   Defendant Susan Hovatter Thornton ("Thornton") was Blue Coat's Vice President, General Counsel and Assistant Secretary from January 2000 to at least May 2001. Because of Thornton's positions, she knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith. Defendant Thornton is a citizen of California.

38.   Defendant Stuart Phillips ("Phillips") was a Blue Coat director from January 1997 to June 2001. Phillips was also a member of the Audit Committee from 1999 to 2002 and a member of the Compensation Committee from 2000 to 2001. Because of Phillips' positions, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or should have known that Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as

1  reports and other information provided to him in connection therewith.  Defendant Phillips sold

2  3,160,490 of his personally-held shares for $252,836,524.46 in proceeds while in possession of

3  material, non-public information concerning the illegally undisclosed manipulated stock option grant

4  practices.  Defendant Phillips is a citizen of California.

5      39.    Defendant Marc Andreessen ("Andreessen") was a Blue Coat director from October

6  1999 to September 2005.  Andreessen was also a member of the Audit Committee from 2003 to

7  2005.  Because of Andreessen's positions, he knew, consciously disregarded, was reckless or grossly

8  negligent in not knowing or should have known that Blue Coat insiders were improperly

9  manipulating stock option grants to maximize their personal profits, via access to internal corporate

10  documents, conversations and connections with other corporate officers and employees, attendance

11  at Board meetings and committees thereof, as well as reports and other information provided to him

12  in connection therewith.  Defendant Andreessen sold 282,044 of his personally-held shares for

13  $12,193,497.09 in proceeds while in possession of material, non-public information concerning the

14  illegally undisclosed manipulated stock option grant practices.  Defendant Andreesen is a citizen of

15  California.

16      40.    Defendant Andrew S. Rachleff ("Rachleff") was a Blue Coat director from

17  October 1997 to September 2005.  Rachleff was also a member of the Audit Committee from 1999

18  to 2005 and a member of the Compensation Committee from 2003 to 2005.  Because of Rachleff's

19  positions, he knew, consciously disregarded, was reckless or grossly negligent in not knowing or

20  should have known that Blue Coat insiders were improperly manipulating stock option grants to

21  maximize their personal profits, via access to internal corporate documents, conversations and

22  connections with other corporate officers and employees, attendance at Board meetings and

23  committees thereof, as well as reports and other information provided to him in connection

24  therewith.  Defendant Rachleff is a citizen of California.

25      41.    Defendant Philip J. Koen ("Koen") was a Blue Coat director from June 2001 to

26  August 2003.  Koen was also a member of the Audit Committee from 2001 to 2003 and a member of

27  the Compensation Committee from 2001 to 2003.  Because of Koen's positions, he knew,

28  consciously disregarded, was reckless or grossly negligent in not knowing or should have known that

Blue Coat insiders were improperly manipulating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Defendant Koen is a citizen of Texas.

42.     Defendant E&Y was engaged by Blue Coat to provide independent auditing and/or consulting services to the Company, including the preparation, examination and/or review of Blue Coat's annual and interim financial statements for the period November 1999 to the present, during which financial statements were disseminated to Blue Coat shareholders and filed with the SEC. E&Y was engaged to perform and performed these services so that Blue Coat's financial statements would be presented to, and reviewed and relied upon by Blue Coat shareholders, governmental agencies, the investing public and members of the financial community. As a result of the services it rendered to Blue Coat, E&Y's representatives were frequently present at Blue Coat's corporate headquarters and financial offices from November 1999 to the present. Thus, E&Y's representatives had continual access to Blue Coat's confidential, non-public corporate financial and business information, including information concerning the Company's executive compensation and stock option data and its true financial condition and financial statements, which information E&Y representatives were aware of and/or consciously or negligently disregarded. E&Y actively participated in the presentation, review and issuance of Blue Coat's improper financial statements. E&Y issued unqualified audit reports on Blue Coat's financial statements for the period from November 1999 to the present. E&Y also reviewed the Company's interim financial statements. Defendant E&Y is headquartered in New York.

43.     The defendants identified in ¶¶19, 25-29, 38-41 are referred to herein as the "Director Defendants." The defendants identified in ¶¶19-25, 29-37 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶19-23, 25, 29-33, 38-39 are referred to herein as the "Insider Selling Defendants." The defendants identified in ¶¶19-25, 30-36 are referred to herein as the "Options Recipient Defendants." Collectively, the Director Defendants, the Officer Defendants,

the Insider Selling Defendants and the Option Recipient Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers, directors and/or fiduciaries of Blue Coat and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Blue Coat and its shareholders fiduciary obligations of trust, loyalty, good faith and due care and were and are required to use their utmost ability to control and manage Blue Coat in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Blue Coat and its shareholders so as to benefit all shareholders equally and not in furtherance of the personal interest or benefit of the Individual Defendants.

45.     Each director and officer of the Company owes to Blue Coat and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the compensation paid to its executives, directors and employees.  These disclosures necessarily include the value of stock options granted to the Company's insiders.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Blue Coat, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as the Company's disclosures of its financial results including expenses related to stock option grants.  Because of their advisory, executive, managerial and directorial positions with Blue Coat, each of the Individual Defendants had access to adverse, non-public information about the financial condition and improper representations of Blue Coat.

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Blue Coat and was at all times acting within the course and scope of such agency.

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1    48.    To properly discharge their duties, Blue Coat's officers and directors were required to

2  exercise reasonable and prudent supervision over the management, policies, practices and controls of

3  the financial affairs of the Company.  By virtue of such duties, the officers and directors of Blue

4  Coat were required to, among other things:

5    (a)    Ensure that the Company complied with its legal obligations and

6  requirements, including acting only within the scope of its legal authority and disseminating truthful

7  and accurate statements to the SEC and the investing public;

8    (b)    Conduct the affairs of the Company in an efficient, business-like manner so as

9  to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting

10  the Company's assets;

11    (c)    Properly and accurately guide investors and analysts as to the true financial

12  condition of the Company at any given time, including making accurate statements about the

13  Company's financial results and ensuring that the Company maintained an adequate system of

14  internal controls such that the Company's financial reporting would be true and accurate at all times;

15    (d)    Remain informed as to Blue Coat's internal controls and, upon receipt of

16  notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in

17  connection therewith, and to take steps to correct such conditions or practices and make such

18  disclosures as necessary to comply with federal and state securities laws;

19    (e)    Ensure that Blue Coat was properly handling its tax liabilities;

20    (f)    Ensure that Blue Coat's internal controls were sufficient to prevent stock

21  option manipulations, including, but not limited to, backdating and springloading; and

22    (g)    Ensure that the Company was operated in a diligent, honest and prudent

23  manner in compliance with all applicable federal, state and local laws, rules and regulations.

24    49.    Each Individual Defendant, by virtue of his or her position as a director and/or

25  officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and

26  the exercise of due care and diligence in the management and administration of the affairs of the

27  Company, as well as in the use and preservation of its property and assets.  The conduct of the

28  Individual Defendants complained of herein involves a knowing and culpable violation of their

1    fiduciary obligations as directors and officers of Blue Coat, the absence of good faith on their part
2    and a reckless disregard for their duties to the Company and its shareholders that the Individual
3    Defendants were aware or should have been aware posed a risk of serious injury to the Company.
4    The conduct of the Individual Defendants who were also officers and/or directors of the Company
5    has been ratified by the remaining Individual Defendants who collectively comprise all of Blue
6    Coat's Board.

7         50.    The Individual Defendants breached their duties of loyalty and good faith by allowing
8    defendants to cause or by themselves causing the Company to misrepresent its financial results, as
9    detailed herein *infra* and by failing to prevent the Individual Defendants from taking such improper
10   actions.  As a result of the defendants' improprieties, the Company has and will need to expend
11   significant sums of money.

12                     **STANDARDS APPLICABLE TO E&Y**

13        51.    The objective of audits of financial statements by independent auditors such as E&Y
14   is for the auditor to express an opinion on the fairness with which such statements present, in all
15   material respects, the Company's financial position, results of operations and cash flows in
16   conformity with Generally Accepted Accounting Principles ("GAAP").  E&Y's report is the medium
17   through which it expresses its opinion or, if circumstances require, qualifies or disclaims an opinion.
18   In either case, E&Y states that its audit has been in accordance with Generally Accepted Auditing
19   Standards ("GAAS").  These standards require E&Y to state whether, in its opinion, Blue Coat's
20   financial statements are presented in accordance with GAAP and to identify those circumstances in
21   which such principles have not been consistently observed in the preparation of the financial
22   statements of the current period in relation to those of the preceding period.

23        52.    GAAS, as approved and adopted by the American Institute of Certified Public
24   Accountants ("AICPA"), are comprised of 10 standards.  These standards to a great extent are
25   interrelated and interdependent.  E&Y is responsible for compliance with GAAS in an audit
26   engagement.  The 10 standards are as follows:

27

28

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

**General Standards**

        (a)     The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

        (b)     In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

        (c)     Due professional care is to be exercised in the performance of the audit and the preparation of the report.

**Standards of Fieldwork**

        (a)     The work is to be adequately planned and assistants, if any, are to be properly supervised.

        (b)     A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed

        (c)     Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

**Standards of Reporting**

        (a)     The report shall state whether the financial statements are presented in accordance with GAAP.

        (b)     The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

        (c)     Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

        (d)     The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

53.     E&Y is one of the largest international firms of certified public accountants and is a member of the AICPA. E&Y was the auditor of Blue Coat's financial statements between November 1999 and the present. In addition, it was paid to review the quarterly financial statements of Blue Coat throughout this period. E&Y audited Blue Coat's financial statements issued between November 1999 and the present, and issued its audit opinions stating that those financial statements were fairly presented in accordance with GAAP and that it had audited those financial statements in accordance with GAAS. Both of those statements were false. E&Y was aware of facts that undeniably precluded it from making those statements at the time they were made. Blue Coat's financial statements and E&Y's opinions on them were then used by Blue Coat with E&Y's consent to publicly disseminate Blue Coat's financial results in the filing of its annual Forms 10-K with the SEC.

54.     As Blue Coat's independent accountant, E&Y was negligent in failing to comply with GAAS. E&Y issued unqualified opinions stating that financial statements of Blue Coat were fairly presented in accordance with GAAP, when E&Y was aware of or should have been aware of facts and circumstances that materially undermined such unqualified opinions and rendered them false and misleading.

**THE BOARD AND ITS COMMITTEES' DUTIES CONCERNING BLUE COAT'S STOCK OPTION PLANS AND OPTION GRANT PRACTICES**

55.     The granting of stock options to Blue Coat insiders, at times relevant hereto, was governed by two plans: the 1999 Stock Incentive Plan ("1999 Plan") and the 2000 Supplemental Stock Option Plan ("2000 Plan"). The 1999 and 2000 Plans are collectively referred to herein as the "Plans."

**The 1999 Plan**

56.     The 1999 Plan provides for the granting of incentive stock options and non-statutory stock options. Incentive stock options are options that may only be granted to employees under certain conditions prescribed by the federal tax code in order to achieve certain tax benefits. Non-statutory stock options are not restricted by the tax code and do not have the tax benefits of incentive stock options.

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

57.     The 1999 Plan restricted the exercise price of incentive stock option grants in order to comply with the tax code.  Specifically, the 1999 Plan provides that the exercise price "shall in no event be less than 100% of the Fair Market Value of a Common Share on the date of grant ...."

58.     The 1999 Plan also restricted the exercise price of non-statutory stock options to no "less than 85% of the Fair Market Value of a Common Share on the date of grant."

59.     The 1999 Plan was administered by a committee of at least two Board members.  The 1998 Plan specifically provides that "[t]he Plan shall be administered by the Committee.  The Committee shall consist exclusively of two or more directors of the Company, who shall be appointed by the Board."  According to Blue Coat's 2001 annual proxy, the Compensation Committee had the authority to administer Blue Coat's stock option plans.

60.     The Compensation Committee had the following authority under the 1999 Plan:

> The Committee shall (a) select the Employees, Outside Directors and Consultants who are to receive Awards under the Plan, (b) determine the type, number, vesting requirements and other features and conditions of such Awards, (c) interpret the Plan and (d) make all other decisions relating to the operation of the Plan. The Committee may adopt such rules or guidelines as it deems appropriate to implement the Plan.

### The 2000 Plan

61.     The 2000 Plan only provides for the grant of non-statutory stock options.

62.     The 2000 Plan restricts the exercise price of non-statutory stock options to no "less than 25% of the Fair Market Value of a Common Share on the date of grant."

63.     The 2000 Plan was administered by a committee of at least two Board members.  The 2000 Plan specifically provides that "[t]he Plan shall be administered by the Committee.  The Committee shall consist exclusively of two or more directors of the Company, who shall be appointed by the Board."  According to Blue Coat's 2001 annual proxy, the Compensation Committee had the authority to administer Blue Coat's stock option plans.

64.     The Compensation Committee had the following authority under the 2000 Plan:

> The Committee shall (a) select the Employees, Outside Directors and Consultants who are to receive Awards under the Plan, (b) determine the type, number, vesting requirements and other features and conditions of such Awards, (c) interpret the Plan and (d) make all other decisions relating to the operation of the Plan. The Committee may adopt such rules or guidelines as it deems appropriate to implement the Plan.

- 23 -

**The Board and Its Committees Violated Blue Coat's Stock Option Plans**

65.     The Options Recipient Defendants' manipulated stock options were granted below fair market value in the case of incentive stock options.  As to non-statutory stock options, the Options Recipient Defendants' manipulated stock options and used improper measurement dates that resulted in the actual grant date differing from the disclosed grant date. Thus, the Compensation Committee, which had the authority and responsibility to approve the manipulated option grants, violated the Plans.  Further, defendants' options manipulation practices resulted in truncated stock-option vesting periods—a further violation of the Plans.  In turn, because the Plans were violated, the manipulated options granted under these Plans must be cancelled and declared void.

66.     Blue Coat's Audit Committee also played a role in the options manipulation. According to the Audit Committee's charter effective during 2000, the Audit Committee was responsible for reviewing Blue Coat's significant accounting and reporting principles, policies and practices.  These principles, policies and practices included Blue Coat's adherence to SFAS No. 123, "Accounting for Stock-Based Compensation" and Accounting Principles Board Opinion No. 25 ("APB 25").  Under SFAS No. 123 and APB 25, a compensation expense must be taken if options are not granted at fair market value.  Because defendants' illegally manipulated options resulted in below fair market value grants, Blue Coat was forced to restate its prior financials to record stock option compensation expenses.

67.     Blue Coat created a Stock Option Committee during May 2005.  According to its charter, the Stock Option Committee was and is responsible for stock option grants to Blue Coat consultants and employee, but not executive officers.

68.     Accordingly, defendants NeSmith, Hanna, Barth, Howes, Geeslin, Malcolm, Phillips and Andreessen, who were directors between 1999 and 2005, were directly responsible for the stock-option backdating improprieties.  Thus, these defendants are also liable to Blue Coat in addition to the defendants who received backdated options. The following chart details the defendants and other individuals who held positions on the Board and Audit Committees when Blue Coat granted stock options that were suspiciously dated at or near monthly low stock prices or before significant appreciations in stock price:

- 24 -

| Manipulated Options Grant Date | Audit Committee Members | Compensation Committee Members | Stock Option Committee | Directors |
|---|---|---|---|---|
| April 17, 2000 | Phillips, Rachleff | Hanna, Phillips | - | Andreessen, Hanna, Malcolm, NeSmith, Phillips, Rachleff |
| April 4, 2001 | Phillips, Rachleff | Hanna, Phillips | - | Andreessen, Hanna, Phillips, NeSmith, Rachleff |
| May 1, 2001 | Phillips, Rachleff | Hanna, Phillips | - | Andreessen, Hanna, Phillips, NeSmith, Rachleff |
| July 10, 2002 | Hanna, Koen, Rachleff | Hanna, Koen | - | Andreessen, Hanna, Koen, NeSmith, Rachleff |
| July 30, 2003 | Hanna, Koen, Rachleff | Hanna, Koen | - | Andreessen, Hanna, Koen, NeSmith, Rachleff |
| February 4, 2004 | Andreessen, Hanna, Rachleff | Hanna, Rachleff | - | Andreessen, Hanna, NeSmith, Rachleff |
| May 28, 2004 | Andreessen, Hanna, Rachleff | Hanna, Rachleff | | Andreessen, Hanna, NeSmith, Rachleff, Shiveley[1] |
| August 26, 2004 | Andreessen, Hanna, Rachleff | Hanna, Rachleff | - | Andreessen, Hanna, NeSmith, Rachleff, Shiveley |
| May 2, 2005 | Barth, Hanna, Rachleff | Hanna, Rachleff | - | Andreessen, Barth, Hanna, NeSmith, Rachleff, Shiveley |
| August 16, 2005 | Barth, Hanna, Rachleff | Hanna, Rachleff | NeSmith | Andreessen, Barth, Hanna, NeSmith, Rachleff, Shiveley |

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

69.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

70.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that Company insiders were improperly manipulating their stock option grants; (ii) conceal the fact that

---

[1] As defined in ¶132, *infra*.

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

as a result of the improperly manipulated stock option grants, the Company's financial statements were inaccurate; (iii) maintain the Individual Defendants' executive and directorial positions at Blue Coat and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iv) deceive the shareholders of Blue Coat, regarding the level of compensation being paid to the Company's insiders and the Company's financial condition and future business prospects; and (v) artificially inflate the price of Blue Coat common stock so they could dispose of over $48 million of their personally held stock.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

71.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During such time, the Individual Defendants caused the Company to conceal the true fact that Blue Coat was misrepresenting its financial results and that Blue Coat insiders were improperly manipulating their stock option grants.

72.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to grant themselves and other insiders undisclosed and unaccounted for compensation in the form of manipulated stock option grants and to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, insider trading, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

73.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

## THE STOCK OPTION BACKDATING SCANDAL

75.     The traditional rationale behind the granting of stock options is to align the interests of a company's officers, directors and employees with the interests of the company's shareholders. When an option is granted at or below full market value, that option is worthless until the grantee creates value in the option by building value in the company.  In such a case, the option grantee and shareholders share in the value created.  The backdating of options, however, subverts this principle because the instant paper gain of a backdated stock option only benefits the insider.

76.     On March 18, 2006, the *Wall Street Journal* published an article entitled: "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable. Luck – or something else?"  The article stated in pertinent part:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.
>
> His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.
>
> Just lucky?  A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote -- around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.
>
> Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.
>
> The Journal's analysis of grant dates and stock movements suggests the problem may be broader. It identified several companies with wildly improbable option-grant patterns. While this doesn't prove chicanery, it shows something very odd: Year after year, some companies' top executives received options on unusually propitious dates.
>
> The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense. And because options grants are long-lived, some executives holding backdated grants from the late 1990s could still profit from them today.

* * *

Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, or the 4 p.m. price the day before. Naturally, the lower it is, the more money the recipient can potentially make someday by exercising the options.

Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.

77.     Lynn Turner, former Chief Accountant of the SEC, has described stock option backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line ...." In a recent article published by the *Wall Street Journal*, Arthur Levitt, a former chairman of the SEC was quoted as stating that stock-option backdating "represents the ultimate in greed." Further, Levitt stated: "It is stealing, in effect. It is ripping off shareholders in an unconscionable way." San Diego analyst Michael Cohen later made similar comments published by *Bloomberg*: "Stockholders are hit twice ... first you're stolen from, then the stock goes down when the theft is uncovered." Senator Chuck Grassley, Chairman of the Senate Finance Committee, concurs. He referred to stock-option backdating as "disgusting and repulsive." Grassley stated: "It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' Even worse in this situation, most of the perpetrators had already gotten 'theirs' in the form of six and seven-figure compensation packages of which most working Americans can only dream."

78.     On May 5, 2006, President George W. Bush stated in an interview on the *Kudlow & Company* show airing on CNBC that "overcompensating or trying to backdate things is bad for America and there ought to be consequences when people don't tell the truth and are not transparent."

79.     On July 20, 2006, the SEC announced it had filed civil charges against two former Brocade Communications Systems, Inc. executives for illegally manipulating stock option grant

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   dates.   Criminal charges were brought simultaneously, indicating the serious view taken by
2   governmental agencies with respect to improperly backdated options.

3          80.     In a news conference detailing the charges, SEC Chairman Christopher Cox
4   proclaimed that "the full weight of the federal government is being put behind this effort to stamp
5   out fraudulent stock option backdating." He disclosed that additional cases likely would be brought
6   in the "coming weeks and months." In later testimony before a Senate committee, Christopher Cox
7   indicated that the SEC is currently investigating more than 100 companies, a large percentage of
8   which are tech companies, meaning many more executives could face criminal charges related to
9   manipulating options.

10         81.     Government disgust at stock-option backdating reached a new level on July 31, 2006,
11   when the FBI issued an arrest warrant for Kobi Alexander ("Alexander") – former CEO of Comverse
12   Technology, Inc. ("Comverse"). Alexander was charged with conspiracy related to backdated stock
13   options. Not surprisingly, on August 9, 2006, he and fellow company cohorts David Kreinberg
14   ("Kreinberg") (former CFO of Comverse) and William F. Sorin ("Sorin") (Comverse's former
15   General Counsel) were criminally charged by the New York U.S. Attorney's Office for allegedly
16   orchestrating a decade-old scheme to fraudulently backdate option grants and for operating a secret
17   stock options slush fund.  After transferring more than $57 million from the U.S. to accounts in the
18   Middle East, Alexander fled the country.

19         82.     Emphasizing the importance that the U.S. government has placed on dealing with the
20   backdating options scandal, Alexander was placed on the FBI's most wanted list.    On
21   September 27, 2006, after an international manhunt, Alexander was captured in Namibia, and is
22   expected to be extradited to the U.S. to stand trial with his alleged co-conspirators Kreinberg and
23   Sorin.  On October 24, 2006, Kreinberg (Comverse's former CFO) pled guilty to securities fraud
24   charges in federal court, and faces up to 15 years in prison.  He was reportedly the first person to
25   plead guilty in the widening stock option backdating scandal.

26         83.     Also, on October 24, 2006, Kreinberg agreed to settle SEC charges for $2.4 million in
27   disgorgement and interest and is permanently barred from serving as an officer or director of any
28   company that has a class of securities registered pursuant to §12 of the Securities Exchange Act of

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   1934 (the "Exchange Act") or that is required to file reports pursuant to §15(d) of the Exchange Act.

2   Shortly thereafter, on November 6, 2006, Sorin (Comverse's former General Counsel) pled guilty to

3   a federal criminal conspiracy charge related to the backdating scheme at Comverse.  The charge

4   carries a maximum penalty of five years in prison.  Kreinberg and Sorin are the first two executives

5   succumbing to criminal charges in the widening backdating scandal, which now encompasses well

6   over 100 companies under investigation by the SEC.

7        84.   On August 7, 2007, Gregory Reyes ("Reyes"), CEO of Brocade Communications

8   Systems, Inc., became the first executive to be convicted of fraud in connection with options

9   backdating.  Reyes' conviction shows that juries consider illegal options backdating to be a crime

10  deserving of jail time.  Reyes currently faces up to 20 years in prison and a $5 million fine.

11              **DEFENDANTS' ILLEGAL OPTIONS MANIPULATING PRACTICES**

12       85.   Dating back to at least 1999, the Individual Defendants have caused or allowed Blue

13  Coat insiders to manipulate their stock option grant dates so as to illegally maximize their profits

14  from the stock options.  Specifically, Company insiders cherry-picked their respective stock option

15  grant dates to take advantage of lower exercise prices than the price on the actual grant date.  The

16  price of Blue Coat shares on the reported option-grant date, therefore, was lower than the share price

17  on the actual day the options were issued, thus providing defendants with more favorably priced

18  options.  The Blue Coat Board, in turn, approved the grants of the options to Blue Coat insiders even

19  though those options were improperly manipulated.

20       86.   Plaintiffs undertook a systematic, thorough analysis to determine whether any grants

21  of Blue Coat stock options could be characterized as "suspicious" – *i.e.*, whether a stock option

22  demonstrated a significant probability that its grant date was selected as a result of backdating or

23  springloading by one or more Individual Defendants.

24       87.   First, plaintiffs analyzed Blue Coat's stock price movement within a three-month

25  window around each option grant to determine if any grants were dated at or relatively near the

26  Company's lowest share price for the month, quarter or year in which it was granted.  Plaintiffs then

27  selected an initial pool of stock options for further analysis based upon those options carrying a

28

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   purported grant date that occurred either in close proximity to the lowest share price of the month, or

2   shortly before a substantial increase in price of the Company's stock.

3       88.   Next, plaintiffs determined if the grants in the initial pool could be explained by non-

4   suspicious circumstances.   Examples of such circumstances include: (i) options granted in

5   conjunction with an annual meeting; (ii) options granted under stock option plans that provide for

6   automatic option grants on a particular date each year; (iii) options of which the recipient disclosed

7   the grant within a few days of the grant; and (iv) options that appeared to be consistently granted at

8   the same time each year to take advantage of readily-foreseeable, historic dips in Blue Coat's stock

9   price.

10      89.   After eliminating option grants encompassed by such circumstances, plaintiffs

11  conducted further analysis to determine if an overall pattern of suspicious option granting existed

12  over a particular time period, and then to define that period. In particular, plaintiffs compared the

13  Options Recipient Defendants' returns to the returns of a typical Blue Coat investor to determine if

14  such defendants enjoyed a return that was significantly in excess of the returns experienced by the

15  average non-insider investor from the general public.   Plaintiffs also conducted a probability

16  analysis, further described below, to determine the overall probability that the pattern of suspicious

17  option grants occurred strictly by chance.   Plaintiffs' analysis also took into account Blue Coat's

18  publicly-filed disclosures relative to the manipulation of Company stock options that were never

19  before disclosed in public filings.

20      90.   Based upon this analysis and Blue Coat's public filings, plaintiffs found a suspicious

21  pattern of stock option manipulation that occurred between 1999 and August 2005.   The eventual

22  disclosure of underlying documentation for all Blue Coat stock options granted during the Relevant

23  Period may well disclose a much greater breadth of illicit activity.   The following grants are the

24  grants that plaintiffs selected as suspicious of options manipulation:

25  ///

26  ///

27  ///

28  ///

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   ///

2   ///

3



### April 2000 Stock Option Grants

On April 17, 2000, options were granted at an exercise price of $152.50 per share - the lowest share price for the period beginning November 19, 1999 through December 20, 2000 - to the following Blue Coat insiders:

| | | | |
|---|---|---|---|
| Michael J. Johnson (1) | 30,000 | Alan L. Robin (1) | 30,000 |
| Rangaswamy Vasudevan (2) | 24,000 | William S. Warner (2) | 4,000 |

On April 28, 2000, defendants' options were worth approximately **$19,250,000.**

On July 13, 2000, defendants' options were worth approximately **$24,640,000.**

(1) On June 14, 2000, defendants Johnson and Robin reported these grants on Form 5's.
(2) No disclosures located for these defendants.



### April 2001 Stock Option Grants

On April 4, 2001, defendants purportedly granted the following options at an exercise price of $15.31 per share - the lowest share price for the fiscal year ended April 30, 2001 - to the following Blue Coat insiders:

| | | | |
|---|---|---|---|
| David W. Hanna (1) | 17,000 | John M. Scharber (2) | 65,000 |

(1) On July 5, 2001, defendant Hanna reported this grant on a Form 5.
(2) On May 21, 2001, defendant Scharber reported this grant on a Form 3.

- 32 -

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



May 2001 Stock Option Grants

On May 1, 2001, defendants purportedly granted the following options at an exercise price of $30.50 per share - the lowest share price for the month of May - to the following Blue Coat insider:

Robert P. Verheecke (1)          100,000

(1) On May 21, 2001, defendant Verheecke reported this grant on a Form 3.



July 2001 Stock Option Grants

On July 31, 2001, defendants purportedly granted the following options at an exercise price of $16.75 per share - the lowest share price for the month of July - to the following Blue Coat insiders:

Alan L. Robin (1)          30,000     Robert P. Verheecke (2)          100,000

(1) No disclosure located for this defendant.
(2) On June 11, 2002, defendant Verheecke disclosed this grant on a Form 5.

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT



August 2004 Stock Option Grants

On August 26, 2004, defendants purportedly granted the following options at an exercise price of $11.95 per share - within $1.54 or 14.9% of the lowest share price for the fiscal year ended April 30, 2005 - to the following Blue Coat insider:

Cameron S. Laughlin (1)     12,500

(1) On June 14, 2005, defendant Laughlin reported this grant on a Form 3.

91.     The following table provides an estimate as to the illegal paper profit that the defendants identified in the prior charts gained as a result of their stock option manipulations:

| Defendants | Reported Grant Date | Adjusted Number of Securities Underlying Options | Adjusted Price of Stock on Reported Date | Estimated Actual Exercise Price Range | | | Estimated Paper Profit Average |
|---|---|---|---|---|---|---|---|
| | | | | Low | | High | |
| Johnson | 4/17/2000 | 30,000 | $152.50 | $185.31 | - | $371.25 | $3,838,500.00 |
| Robin | 4/17/2000 | 30,000 | $152.50 | $185.31 | - | $371.25 | $3,838,500.00 |
| Vasudevan | 4/17/2000 | 24,000 | $152.50 | $185.31 | - | $371.25 | $3,070,800.00 |
| Warner | 4/17/2000 | 4,000 | $152.50 | $185.31 | - | $371.25 | $511,800.00 |
| Hanna | 4/4/2001 | 17,000 | $15.31 | $17.81 | - | $42.65 | $213,520.00 |
| Scharber | 4/4/2001 | 65,000 | $15.31 | $17.81 | - | $42.65 | $816,400.00 |
| Verheecke | 5/1/2001 | 100,000 | $30.50 | $31.40 | - | $46.05 | $991,000.00 |
| Robin | 7/31/2001 | 30,000 | $16.75 | $17.45 | - | $23.65 | $69,660.00 |
| Verheecke | 7/31/2001 | 100,000 | $16.75 | $18.45 | - | $23.65 | $232,200.00 |
| NeSmith | 7/10/2002 | 100,000 | $2.25 | $2.35 | - | $2.59 | $14,000.00 |
| Verheecke | 7/10/2002 | 50,000 | $2.25 | $2.35 | - | $2.59 | $7,000.00 |
| Cox | 7/30/2003 | 66,000 | $5.44 | $5.45 | - | $8.10 | $47,038.20 |
| Mullaney | 7/30/2003 | 88,000 | $5.44 | $5.45 | - | $8.10 | $62,480.00 |
| de Simone | 9/3/2003 | 180,000 | $8.04 | $8.10 | - | $12.60 | $427,320.00 |
| Laughlin | 5/28/2004 | 30,000 | $27.80 | $28.96 | - | $33.95 | $100,547.40 |
| Laughlin | 8/26/2004 | 12,500 | $11.95 | $13.44 | - | $15.51 | $33,500.00 |
| Total | | 926,500 | | | | | $14,274,265.60 |

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1      92.    The following charts compare the returns on stock options realized by defendants to

2 the returns realized by average Blue Coat investors for suspicious and non-suspicious grants from

3 April 2000 to the present.  The "Defendant Option Grant Date" column lists the various dates on

4 which Blue Coat insiders were granted suspiciously-dated stock options.  The "Defendant 20-Day

5 Return" column shows the return realized by Blue Coat insiders in the twenty days following the

6 option grant date.  This amount is compared to the "Investor Average 20-Day Return" column,

7 which lists the average return realized by average Blue Coat investors over a typical twenty-day

8 period in the year of the grant date.  The percentage difference between these two returns is shown in

9 the "Defendant Excess Return" column. A May 22, 2006 report by Merrill Lynch entitled *Options*

10 *Pricing - Hindsight is 20/20* stated*:* "Theoretically, companies should not be generating any

11 systematic excess return in comparison to other investors as a result of how options pricing events

12 are timed." Conversely, suspiciously dated option grants by Blue Coat did generate large excess

13 returns in comparison to grants not suspiciously dated, thereby strongly suggesting the occurrence of

14 grant date manipulation.

15 **Suspicious Grants**

| Defendant Option Grant Date | Defendant 20-Day Return | Investor Average 20-Day Return | Defendant Excess Return | Defendant Annualized Return | Investor Annual Return | Defendant Excess Return |
|---|---|---|---|---|---|---|
| 4/17/2000 | 53.69% | -4.76% | 58.46% | 979.88% | -86.94% | 1066.82% |
| 4/4/2001 | 129.26% | -4.62% | 133.88% | 2359.03% | -84.29% | 2443.32% |
| 5/1/2001 | 24.75% | -4.62% | 29.37% | 451.76% | -84.29% | 536.06% |
| 7/31/2001 | -6.57% | -4.62% | -1.95% | -119.85% | -84.29% | -35.56% |
| 7/10/2002 | 2.22% | -3.87% | 6.09% | 40.56% | -70.67% | 111.23% |
| 7/30/2003 | 32.35% | 25.63% | 6.73% | 590.44% | 467.68% | 122.76% |
| 9/3/2003 | 37.19% | 25.63% | 11.56% | 678.70% | 467.68% | 211.02% |
| 2/4/2004 | 97.82% | -0.91% | 98.73% | 1785.16% | -16.58% | 1801.74% |
| 5/28/2004 | 22.12% | -0.91% | 23.03% | 403.73% | -16.58% | 420.32% |
| 8/26/2004 | 16.74% | -0.91% | 17.65% | 305.44% | -16.58% | 322.02% |
| 5/2/2005 | 31.87% | 7.98% | 23.89% | 581.69% | 145.67% | 436.02% |
| 8/16/2005 | 40.11% | 7.98% | 32.13% | 732.05% | 145.67% | 586.38% |
| **Average:** | **40.13%** | **3.50%** | **36.63%** | **732.38%** | **63.87%** | **668.51%** |

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

**Other Grants**

| Insider Option Grant Date | Insider 20-Day Return | Investor Average 20-Day Return | Insider Excess Return | Insider Annualized Return | Investor Annual Return | Insider Excess Return |
|---|---|---|---|---|---|---|
| 8/30/2000 | 48.10% | -4.76% | 52.86% | 877.74% | -86.94% | 964.68% |
| 12/29/2000 | 7.60% | -4.76% | 12.36% | 138.71% | -86.94% | 225.66% |
| 8/29/2001 | -57.05% | -4.62% | -52.43% | -1041.11% | -84.29% | -956.81% |
| 9/12/2002 | 5.07% | -3.87% | 8.95% | 92.61% | -70.67% | 163.28% |
| 10/9/2002 | 2.38% | -3.87% | 6.25% | 43.45% | -70.67% | 114.12% |
| 11/20/2002 | -17.29% | -3.87% | -13.42% | -315.60% | -70.67% | -244.93% |
| 6/17/2003 | 2.68% | 25.63% | -22.95% | 48.88% | 467.68% | -418.80% |
| 10/7/2003 | 27.17% | 25.63% | 1.54% | 495.86% | 467.68% | 28.18% |
| 11/28/2003 | 9.49% | 25.63% | -16.14% | 173.14% | 467.68% | -294.54% |
| 5/14/2004 | -19.09% | -0.91% | -18.18% | -348.41% | -16.58% | -331.83% |
| 10/5/2004 | 3.59% | -0.91% | 4.50% | 65.57% | -16.58% | 82.15% |
| 1/14/2005 | 20.48% | 7.98% | 12.50% | 373.80% | 145.67% | 228.12% |
| 5/23/2005 | 47.40% | 7.98% | 39.42% | 865.06% | 145.67% | 719.38% |
| 7/18/2005 | 3.23% | 7.98% | -4.75% | 58.95% | 145.67% | -86.72% |
| 9/20/2005 | -2.17% | 7.98% | -10.15% | -39.53% | 145.67% | -185.21% |
| 11/14/2005 | -13.81% | 7.98% | -21.79% | -251.99% | 145.67% | -397.66% |
| 6/22/2006 | -8.15% | -2.61% | -5.54% | -148.73% | -47.62% | -101.11% |
| 6/27/2006 | -13.32% | -2.61% | -10.71% | -243.11% | -47.62% | -195.49% |
| 12/28/2006 | 4.91% | -2.61% | 7.52% | 89.65% | -47.62% | 137.27% |
| 12/29/2006 | 4.18% | -2.61% | 6.78% | 76.20% | -47.62% | 123.82% |
| 3/14/2007 | -2.45% | 7.23% | -9.68% | -44.79% | 131.86% | -176.65% |
| 4/19/2007 | 10.10% | 7.23% | 2.87% | 184.32% | 131.86% | 52.46% |
| 4/30/2007 | 11.52% | 7.23% | 4.30% | 210.30% | 131.86% | 78.44% |
| 6/21/2007 | 13.00% | 7.23% | 5.78% | 237.32% | 131.86% | 105.46% |
| **Average:** | **3.65%** | **4.49%** | **-0.84%** | **66.60%** | **81.88%** | **-15.28%** |

93.     Plaintiffs' analysis identified a total of 36 option grants by Blue Coat from 1999 to the present. Plaintiffs concluded that twelve of these grants appeared to be subject to purposeful grant date manipulation. The table below ranks the twelve manipulated grants according to the grant price selected for the month; *i.e.*, a "1" ranking indicates an option grant set at the lowest closing share price for that month. The table also sets forth the percentage returns for Blue Coat stock during the twenty days after the respective grant date. As shown below, the twenty-day stock return for the ten manipulated option grants averaged over 43 percent. In comparison, the other 26 grant dates were

- 38 -

1  followed by an average twenty-day stock return of 5.46 percent. Of the manipulated grants, nine

2  were granted on the lowest day of their respective months.  The Options Recipient Defendants'

3  excessive returns from these grants as well as the low monthly ranking of these grants—nine were

4  ranked at the lowest closing share price of the month—strongly infer that these particular grants

5  were manipulated.

6

**Suspicious Grants**

| Grant Date | Monthly Rank | 20 Day Return |
|---|---|---|
| 4/17/2000 | 1 | 53.69% |
| 4/4/2001 | 1 | 129.26% |
| 5/1/2001 | 1 | 24.75% |
| 7/31/2001 | 1 | -6.6% |
| 7/10/2002 | 1 | 2.22% |
| 2/4/2004 | 1 | 97.82% |
| 5/28/2004 | 1 | 22.1% |
| 5/2/2005 | 1 | 31.87% |
| 8/16/2005 | 1 | 47.40% |
| 7/30/2003 | 2 | 32.4% |
| 9/3/2003 | 5 | 37.2% |
| 8/26/2004 | 11 | 16.74% |
| | Average: | 40.74% |

**Other Grants**

| Grant Date | Monthly Rank | 20 Day Return |
|---|---|---|
| 12/29/2000 | 1 | 7.6% |
| 4/30/2007 | 1 | 11.5% |
| 12/29/2006 | 2 | 4.2% |
| 8/29/2001 | 3 | -57.0% |
| 6/17/2003 | 3 | 2.7% |
| 7/18/2005 | 3 | 3.2% |
| 4/19/2007 | 3 | 10.1% |
| 10/7/2003 | 4 | 27.2% |
| 5/14/2004 | 4 | -19.1% |
| 12/28/2006 | 4 | 4.9% |
| 9/12/2002 | 6 | 5.1% |
| 6/22/2006 | 6 | -8.1% |
| 10/9/2002 | 9 | 2.4% |
| 1/14/2005 | 9 | 20.48% |
| 10/5/2004 | 10 | 3.6% |
| 3/14/2007 | 10 | -2.5% |
| 5/23/2005 | 12 | 47.40% |
| 11/20/2002 | 14 | -17.3% |
| 6/27/2006 | 18 | -13.3% |
| 11/28/2003 | 19 | 9.5% |

| 9/20/2005 | 20 | -2.2% |
|---|---|---|
| 11/14/2005 | 20 | -13.8% |
| 6/21/2007 | 20 | 13.0% |
| 8/30/2000 | 21 | 48.1% |
| | Average: | 3.65% |

94.     The probability that the overall pattern of options grants described above was subject to options manipulation can be illustrated by a binomial experiment. Binomial experiments involve repeating an event that only has two possible outcomes over and over again to create a particular set of results known as a "distribution." For example, flipping a coin 10 times to see how many times "heads" comes up would qualify as a binomial experiment. A mathematical formula is then used to determine the probability of a particular distribution being repeated. Continuing with the coin flip analogy, the probability that one could repeatedly get a binomial distribution of all heads is rather rare.

95.     Applying this analysis to stock options involves assuming two outcomes for a particular options grant: either the grant occurred on a day during a particular time period at which the Company's stock price was at its lowest point for that period, or it was not. Plaintiffs undertook a binomial analysis with this assumption by: (i) determining the total number of stock options grants that were granted between 2000 and 2005, which corresponds with the time period during which plaintiffs suspect that backdating occurred at Blue Coat; (ii) determining how many times options were granted at the lowest stock price for a 20-day trading period during the month in which the option was granted; (iii) computing the probability of choosing the lowest price during this 20-day period by chance, which is one in 20 or 5%; and (iv) entering the foregoing figures into a binomial formula regularly used by statisticians. That binomial formula is as follows:

$$P = \frac{n\ (p^k)(q^{n-k})}{k\ (n-k)}$$

Where:

n = total number of option grants
k = number of times that the Individual Defendants dated stock options on day reflecting the lowest Blue Coat stock price in a 20 day period
p = probability of selecting the lowest day of the month by chance
q = probability of not selecting the lowest day of the month by chance
P = the overall probability that the option grants distribution occurred by chance

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

96. Plaintiffs used the following values to calculate the probability that the Individual Defendants' stock option grant distribution occurred by chance: n=28, k=10, p=.05, q=.95.

97. Here is the calculation that results from inserting the above-described figures into the formula:

$$P = \frac{28(.05^{10})(.95^{28-10})}{9\,(28-10)} \longrightarrow P = 5.09051^{-7} \text{ or } \underline{1 \text{ in } 1{,}964{,}438} \; (1/5.09051^{-7})$$

98. In sum, the binomial probability that the pattern of the Options Recipient Defendants' option grants occurred strictly by chance is **one in 1,964,438**. In comparison, the odds of being struck by lighting are a mere one in 30,000.

99. The table below is a summary of the underlying data used to calculate this probability:

| Quarter Ended | Options Grant Date | Number of Shares in Grant | Options Strike Price | Monthly Low Price | Monthly Rank |
|---|---|---|---|---|---|
| April 30, 2000 | April 17, 2000 | 88,000 | $152.50 | $152.50 | 1 |
| October 31, 2000 | August 30, 2000 | 4,000 | $525.00 | $319.69 | 19 |
| January 31, 2001 | December 29, 2000 | 20,000 | $85.31 | $85.31 | 1 |
| April 30, 2001 | April 4, 2001 | 82,000 | $15.31 | $15.31 | 1 |
| July 31, 2001 | May 1, 2001 | 100,000 | $30.50 | $30.50 | 1 |
| July 31, 2001 | July 31, 2001 | 130,000 | $16.75 | $16.75 | 1 |
| October 31, 2001 | August 29, 2001 | 3,000 | $14.90 | $12.95 | 3 |
| July 31, 2002 | July 10, 2002 | 150,000 | $2.25 | $2.25 | 1 |
| October 31, 2002 | September 12, 2002 | 4,000 | $3.35 | $3.15 | 5 |
| October 31, 2002 | October 9, 2002 | 24,500 | $3.52 | $3.12 | 9 |
| January 31, 2003 | November 20, 2002 | 66,000 | $3.99 | $3.47 | 18 |
| July 31, 2003 | June 17, 2003 | 50,000 | $5.60 | $5.51 | 4 |
| July 31, 2003 | July 30, 2003 | 154,000 | $5.44 | $5.36 | 2 |
| October 31, 2003 | September 3, 2003 | 180,000 | $8.04 | $8.00 | 5 |
| October 31, 2003 | October 7, 2003 | 11,250 | $13.36 | $10.70 | 4 |
| January 31, 2004 | November 28, 2003 | 100,000 | $20.87 | $14.81 | 19 |
| April 30, 2004 | February 4, 2004 | 25,000 | $21.53 | $21.53 | 1 |
| July 31, 2004 | May 14, 2004 | 5,000 | $36.09 | $27.80 | 3 |
| July 31, 2004 | May 28, 2004 | 30,000 | $27.80 | $27.80 | 1 |
| October 31, 2004 | August 26, 2004 | 12,500 | $11.95 | $10.41 | 11 |
| October 31, 2004 | October 5, 2004 | 13,750 | $16.70 | $14.81 | 10 |
| January 31, 2005 | January 14, 2005 | 17,500 | $19.09 | $17.63 | 9 |
| July 31, 2005 | May 2, 2005 | 75,000 | $13.93 | $13.93 | 1 |
| July 31, 2005 | May 23, 2005 | 84,200 | $18.08 | $13.93 | 12 |
| July 31, 2005 | July 18, 2005 | 3,500 | $30.03 | $29.87 | 3 |
| October 31, 2005 | August 16, 2005 | 10,000 | $30.24 | $30.24 | 1 |
| October 31, 2005 | September 20, 2005 | 13,000 | $42.47 | $39.12 | 20 |

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| January 31, 2006 | November 14, 2005 | 10,000 | $52.00 | $39.53 | 20 |

100.    To put this analysis in context, plaintiffs conducted a second analysis of Blue Coats' options granted during 2006 and 2007: a period during which plaintiffs suspect that options manipulation did not occur.  The result of that analysis was a probability of approximately one in three and a half.  Here is the calculation that supplied this result:

$$P = \frac{8(.05^{10})(.95^{8-1})}{1(8-1)} \rightarrow P = 0.279334 \text{ or } \underline{1 \text{ in } 3.5799} \ (1/0.279334)$$

101.    The table below is a summary of the underlying data used to calculate this probability:

| Quarter Ended | Options Grant Date | Number of Shares in Grant | Options Strike Price | Monthly Low Price | Monthly Rank |
|---|---|---|---|---|---|
| July 31, 2007 | June 22, 2006 | 10,000 | $14.97 | $14.66 | 6 |
| July 31, 2007 | June 27, 2006 | 5,000 | $16.70 | $14.66 | 20 |
| January 31, 2007 | December 28, 2006 | 98,876 | $24.02 | $23.83 | 4 |
| January 31, 2007 | December 29, 2006 | 242,357 | $23.95 | $23.83 | 2 |
| April 30, 2007 | March 14, 2007 | 95,124 | $36.67 | $31.57 | 10 |
| April 30, 2007 | April 19, 2007 | 85,400 | $35.15 | $35.06 | 4 |
| April 30, 2007 | April 30, 2007 | 49,825 | $35.06 | $35.06 | 1 |
| July 31, 2007 | June 21, 2007 | 96,250 | $49.14 | $41.96 | 20 |

102.    An inference that the Options Recipient Defendants' option grants were manipulated is further supported by the fact that these defendants regularly delayed the disclosure of their option grants even after the enactment of SOX.  SOX requires options recipients to disclose their option grants within two business days of the grant date.  Nevertheless, defendant de Simone did not disclose his September 3, 2003 options grant until October 17, 2003 – more than a month later. Even worse, defendant Laughlin did not disclose his August 16, 2004 options grant until June 14, 2005 – more than *nine months later*.

## DEFENDANTS' ILLEGAL SPRINGLOADING OPTIONS MANIPULATIONS

103.    Springloading is a type of stock option manipulation that involves the illegal misappropriation of inside information so that options are granted shortly before a significant increase in the price of the Company's shares.  As with backdating, springloading brings an immediate paper profit to the option recipients.

- 42 -

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT